Good morning, your honors. Ina Lipkin on behalf of the petitioner. This is a matter that was denied by the Board without opinion, so the IJ's decision is the final agency determination. Here the IJ found the petitioner incredible. And he based those findings on alleged prior statements before the asylum officer, between alleged inconsistencies in the testimony which he deemed were material, but which the petitioner contends did not go to the heart of the claim. And the IJ erroneously found that the petitioner failed to establish a ground upon which he was persecuted, upon an enumerated ground. First let me address the issues of inconsistency as far as they go to credibility. The IJ relied on a credible fear interview taken two days after the petitioner was apprehended at the airport in the United States because he entered on false documentation. The petitioner contends that any statements that he was given during the credible fear interview should not form a basis upon which to find him incredible. First of all, the asylum officer was never made available for cross-examination. We don't know whether he ever gave the petitioner an opportunity to make any amendments or changes to his statements, whether the interpreter used was reliable. In any case, this was a de novo proceeding. The inconsistencies that the IJ relied upon were also minor. It was a difference of dates of when he joined the Armenian National Movement Party, whether it was 1991 or 1993. When I say inconsistencies, I mean the fact that the Armenian National Movement has held on numerous occasions a minor inconsistency and dates that doesn't go to the heart of the claim is not a basis upon which to find a petitioner incredible. As far as some of the internal inconsistencies regarding the date that he started working as a volunteer on fixing the cathedral in Yerevan, again, this is really not material to his claim of persecution. The petitioner has been impeached on his political opinion because of his membership in the A&M party, his participation in protests and meetings in which the government was criticized. He established persecution on an imputed ground. The government perceived that he was a potential whistleblower because they thought he had files that his relative had which shed light on government corruption and the embezzlement of monies. And he established that based on these grounds, he was falsely persecuted. And the judge's finding that he didn't establish persecution on an enumerated ground was false. And is it correct that the wife of the petitioner here and his parents are still living in Armenia? At the time of the individual hearing, when the petitioner was in custody and did not have any means to contact his family in Armenia, he was unable to conclusively state whether they had problems or not. In fact, he was kept in custody for about a year until he was released on humanitarian parole shortly after the individual hearing. But the IJ took into account the fact that his wife and family were still there and they were not persecuted. But there was nothing in the record, Your Honor, to show that they were persecuted or not because the petitioner was unable to contact them to get that information. The IJ assumed that they were there safely. So this is just another example of some of the speculation and conjecture that the IJ relied upon to find the petitioner either incredible or that he  And the reason that the IJ engaged in such speculation was to find some aspects of the claim implausible, such as why would the Armenian Secret Service agents, if you could call them that, would release him for a day in order to gather the files that they suspected that he had? On the surface, it certainly sounds rather suspicious, doesn't it? But the petitioner... But if this is such a police state operation, you would think that that would be counterintuitive. Well, I think there's two things here that the IJ failed to take into account. One, based on the petitioner's credible testimony, he testified that the government agents had a sort of omniscient presence and they had the sort of confidence that they could locate him anywhere. And the other thing is that the IJ was fishing for information. Perhaps they weren't so certain that he really had the files. And in that case, they had to accost him, to threaten him to get some information, then released him to see whether he could get it or not. There's nothing in the record to show that they conclusively knew he had it. And yes, that would seem a little odd. But here it seems that they were fishing for information. I think I'll reserve the rest of the time. You may do so, Counsel. We'll hear from the government. Good morning, Your Honors. May it please the Court, I'm Brent McIntosh, on behalf of Respondent and the Attorney General of the United States. Before I proceed to the main claims here, I want to point out that with regard to the question of petitioner's contact with his wife, at 165 of the record, his counsel asked, Where is your wife today? He responded, In Yerevan. Counsel asked, Have you had any contact with her since you left Armenia? Answer, No, my friend has been in touch to be able to get some documents. So the question of where the wife was at the time is not one that is up in the air, it is one on which petitioner testified. There are two issues here. The first is credibility, and the second is the question of whether the persecution alleged was on account of a protected ground. With regard to the credibility issue, the government submits that the IJ correctly ruled that the petitioner has taken one of the most important events in recent Armenian history, the assassination of a number of politicians of a number of different political parties, including his second cousin, and contrived for himself a bit part in that, which is not only not corroborated, but not corroboratable, because all the witnesses to that bit part are either dead or missing. Well, counsel, this is an unusually high amount of conjecture kind of case. The IJ, the IJ, the IJ, the IJ, the IJ, the IJ, the IJ, the IJ, the IJ, the IJ, the IJ, and the IJ, the IJ, the IJ, the IJ, the IJ, the IJ, the IJ, the IJ, the IJ, and the IJ, the IJ, the IJ, the IJ, the IJ, the IJ, the IJ, the IJ reads into situations, certain kinds of conclusions, within limits I think we probably will go along with that, but in this case, the findings on implausibility are frequent and not entirely supported. What, what should we do? Judge O'Scanlan, in this case, the IJ said that the entire account was implausible, and he cited a pair of examples. One, that the question of whether he would be privy to this incriminating information with regard to the president of the country, and the second, whether he would be released to get that information in a police state. But the IJ, the IJ's opinion makes the point that the entire account is riddled with inconsistencies and implausibilities, and that he was citing examples of these, but the entire account was not one to be credited in light of the fact that this is one of the seminal events in recent Armenian national history. It is a thing that has been investigated by NGOs and the press, and the State Department of Country Report says that NGOs have a right to robustly investigate and report their findings, and there is no corroborating testimony other than petitioners say so. There is no corroborating testimony of petitioners say so that this investigation ever occurred, that the cousin was targeted, that the cousin was targeted because of the second cousin was targeted because of the investigation, that petitioner actually knew of these documents, knew that these documents existed, and the uncle. The two people who could plausibly corroborate this are either dead or missing. There are, conveniently enough, there are, there's no evidence other than petitioners say so that the documents ever existed. There's no evidence of this, the President's, the President's involvement in the assassinations. Indeed, some of the, some of the materials petitioner himself submits suggest that the investigation into the assassinations was biased against the President and tried to implicate him wrongly. Others of the materials that petitioner submits suggest that the, the assassinations in Parliament were conducted by the KGB or the CIA. So the, the plot in question here is one that, once you look at the way petitioner's story changed, the way his story changed from the airport interview to the declarations, the declaration and the corrected declaration, and then his testimony, which was inconsistent with the airport interview, the, and both declarations. Was that really a significant inconsistency? What, what seemed to me in reviewing what the IJ said is he just said this is all implausible. And I wonder what the basis for saying it's implausible. Take, take one example, Judge Hugg. Petitioner in his declaration states that he was approached by people who kidnapped him and wanted to know about his cousin's finances, wanted documents on his cousin's finances, and he had no idea what they were talking about. In his testimony before the IJ, he says he was approached and kidnapped, the very same incident, one question about the same incident, by people who wanted to know about the documents that dealt with the assassination of a high political leader and with corruption in the funding of Impulse, a government, a quasi-governmental that his second cousin had run. Now, in the first instance, he says, I don't have any idea what documents you're talking about, but I'll go try and get them. In the second instance, when he testifies about it again, he describes the set of documents that were requested entirely differently, not as dealing with his cousin's finances, but as dealing with these assassinations, the prior assassination, and with the, the corruption in the Impulse, the conduct of the Impulse quasi-governmental. And he says, of course I had seen those documents. My cousin and my uncle were conducting an investigation, but I told them I would go get the documents, and then I didn't come back. I mean, two totally different descriptions of the seminal event in his claim, one in the declaration, one in his oral testimony. It seems, it seems from the IJ's perspective that he watched this story change from, from airport interview, to first declaration, to corrected declaration, which changed a fact that was a historical fact. The question of whether a high-government official had been, committed suicide or been assassinated. A thing that, it's unclear why that changed. He has no explanation for why that historical fact changed. And then it, his story changed again, as I just described, in going to the oral testimony before the IJ. And, and to, to watch those changes and to see these questions, why would, in a police state, they release him to find the things. To see the fact that this is one of the seminal events in Armenian national history, recent Armenian national history. And there is, it's been investigated fulsomely by NGOs and by the international press, and the State Department even comments on it in their, in the country report, and yet there is no corroboration of the plot. There is indeed very little suggestion of the plot he describes here, self-servingly, to justify his asylum claim. With regard to the question, the second question here, which is, does his alleged knowledge of these documents constitute a political opinion? The government submits that this falls fully within Judge Goodwin's opinion in Sungha, which is at 103 F. 3rd, 1482, where the petitioner there was approached and attempted to be impressed into the, into a local militia. And the reason given there was because we want to harm your father, who was a political opponent. And the reason given was not harm to the petitioner's political views, but to harm the petitioner's relative's political views. Here, similarly, all the testimony from Petitioner, and all the testimony from Petitioner indicates that the motive of the kidnappers was to procure these documents or knowledge of the whereabouts of Petitioner. Now, if you look at Petitioner's uncle, there is no suggestion that he was persecuted before they allegedly came to know that he had knowledge of these documents. He concedes in his brief before the BIA that were he to get the documents and turn them over, the persecution would cease. So literally, the only thing, and he is conceded explicitly in his BIA brief. But aren't the documents themselves, wouldn't they be very much political? The documents are certainly political, but they are not, his knowledge of the documents does not depend on any political position of his own. It's something he came to know of. It certainly seems he testifies that it doesn't matter if it's someone of his party who has knowledge of the documents. I'm sorry, I take that back. His expert testified that it didn't matter who it was who had knowledge of these alleged documents, whether that person was a member of the Armenian National Movement or of some other party. Those people are in danger. It doesn't matter anyone with knowledge of these documents. He testified he had taken no action with regard to the documents and intended to take no action with regard to the documents. His only connection to the documents was knowledge, allegedly, of their whereabouts. Was there evidence that he was in fact a member of the Armenian National Movement? He was. As a government, it does not dispute that he was a member of the Armenian National Movement. Well, there is great hostility in Armenia among the variety of political groups, but there was no evidence that the reason he was targeted was because of his membership in that political group, as opposed to his knowledge of where the documents are, a non-political, non-opinion. Thank you, counsel. Your time has expired. We will hear from Ms. Lipkin. You have some reserved time. Thank you, Your Honor. Thank you, Your Honors. This Court has repeatedly held that even if an applicant doesn't hold a political opinion, what is important is what do his persecutors perceive his opinion to be. It's abundantly clear from the record that here the Armenian security forces perceived the petitioner to hold an anti-national view. What are those views? They believe that he either concretely knew and had evidence of government corruption, or that due to, and this is another enumerated ground persecution, due to his social tie with people who had that information, he was anti-national. The social tie here is with his uncle and cousin. The Court has recently held in Thomas v. Gonzales that a social tie can be the basis for a claim of persecution if the persecutor perceives that person to have some tie with his relative, as in this case. Here the witness of the petitioner corroborated that there was a plot to assassinate the members of parliament, that were killed in October of 99, and he even described how since that time an additional number of people have been killed, for a total of 15 persons killed, and none of those cases investigated by the government. And here that the petitioner doesn't know the details, or himself may have somewhat speculated as to the circumstances or those behind the assassination, well, he just joins the ranks of the world community, that he wouldn't have that information is entirely plausible, and it's speculative. I'm sorry, 15 killings, is that in the record? Yes, I believe it starts on page 147, that's a few pages down, where the witness goes on to state, sort of gives a historical summation of what happened, and corroborates the fact that the Armenian government has allowed the killers to act with impunity in that they have not tracked down any of them, no cases have been opened, and no witnesses have gone forward, even though these were all, these killings occurred in a public forum. Would you want to respond to the Your Honor's contention about the two different stories, the one at the airport and the one for the IG? Yes, Your Honor. Once again, this is a man who had just fled his country, feared for his life, did not know the whereabouts of his uncle and cousin, knew that most likely he would be apprehended at the airport because he had a false passport, had to undergo that stress-laden situation of being apprehended, not knowing what to do, and may or may not have understood every question posed to him. We don't know whether he was even afforded an opportunity at the end of the interview to add something, to make a corruption. It's very possible that he just misspoke during certain aspects of his testimony, such as in dates. I wanted to address another issue that opposing counsel raised, what the Petitioner knew or did not know was contained in the documents and any contradictions that might have arisen from that. In his testimony, he states that when the security forces apprehended him in May of 2002, they wanted to make sure that he was in a state of emergency, and that he was in a state of emergency. He did not know about Armenakian's financial documents. That could have related to his own personal documents, because presumably the Armenian government may have made a false claim that perhaps it was his uncle who had embezzled and not the President. The Petitioner never stated that he saw and read with any sort of detail the documents that his uncle had regarding embezzlement. He saw the documents, he had a general idea that they were about embezzlement, but he didn't, according to the record, look at them thoroughly. So I don't think there's an inconsistency here. He didn't know about his uncle's financial documents. That's what he stated the security forces asked him about. And he knew that there were other documents, the ones about corruption. He didn't know about whatever kind of financial, personal financial situation his uncle might have had. Thank you, Your Honor.
judges: Goodwin, Hug, O'Scannlain